JS-6

1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| CINDY BROWN, | Case No.  8:17-CV-01941-JLS (DFM) |
|---|---|
| Plaintiff, | **ORDER DENYING MOTION TO CONSIDER EXTRINSIC EVIDENCE (Doc. 20)** |
| v. | |
| UNUM LIFE INSURANCE COMPANY OF AMERICA, | **ORDER DENYING MOTION TO STRIKE EXTRINSIC EVIDENCE (Doc. 23.)** |
| Defendant. | **FINDINGS OF FACT AND CONCLUSIONS OF LAW RE: CROSS MOTIONS FOR JUDGMENT (Docs. 17 & 19.)** |

This action arises out of Plaintiff's claim for benefits under a policy for long-term disability insurance. Plaintiff's claim was granted, and she was paid monthly benefits for a period of approximately 22.5 months. Plaintiff's benefits were terminated after that time. Plaintiff appealed the termination, but the termination was upheld by Unum on administrative appeal. Thereafter, Plaintiff filed the present claim for benefits pursuant to the Employee Retirement and Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(1)(B).

The parties have filed cross-motions for judgment pursuant to Federal Rule of Civil Procedure 52. The Court has considered the parties' Motions for Judgment, their responsive briefs, supplemental briefs, and the Administrative Record ("AR") filed by Defendant Unum Life Insurance Company of America ("Unum"). (*See* Docs. 17-19, 22, 24, 33-34.) The Court has also reviewed evidence offered by Plaintiff. (*See* Doc. 20, Pltf. Mot. to Consider Extrinsic Evid., Ex. A; Doc. 23, Def. Mot. to Strike Extrinsic Evid.)

Pursuant to Federal Rule of Civil Procedure 52(a), the Court makes the findings of fact and conclusions of law set forth below.[1] The Court reviews *de novo* Unum's determination to terminate long-term disability benefits. As set forth more fully below, the Court concludes that Plaintiff has established eligibility for long-term disability benefits up to and including December 28, 2016, and remand of Plaintiff's claim is necessary to determine whether Plaintiff remained eligible for benefits after that date.

## I.    FINDINGS OF FACT

On the record before it, the Court makes the following findings of fact.

### A.    Long-Term Disability Policy and Life Insurance Policy

Plaintiff is a participant under an employee welfare benefit plan administered

---

[1] To the extent that any findings of fact are included in the Conclusions of Law section, they shall be deemed findings of fact. To the extent that any conclusions of law are included in the Findings of Fact section, they shall be deemed conclusions of law.

by Unum through a long-term disability insurance policy ("LTD Policy") and a life insurance policy ("Life Policy").[2]  The LTD Policy provides benefits when a covered person's continuous period of total disability, or in some instances partial disability, exceeds an elimination period of 90 days.  (*See generally* LTD Policy.)[3]  Specifically, benefits are provided when a covered person meets the definition of either "total disability" or "partial disability" found in the LTD Policy:

### WHEN ARE YOU TOTALLY DISABLED?

For the first 27 months, you are totally disabled when, as a result of sickness or injury, you are unable to perform with reasonable continuity the substantial and material acts necessary to pursue your usual occupation in the usual and customary way.

After benefits have been paid for 24 months of disability you are totally disabled when, as a result of sickness or injury, you are not able to engage with reasonable continuity in any occupation in which you could reasonably be expected to perform satisfactorily in light of your age, education, training, experience, station in life, and physical and mental capacity.

. . . .

### WHEN ARE YOU PARTIALLY DISABLED?

You are partially disabled when you are not totally disabled and that while actually working in your usual occupation, as a result of sickness or injury you are unable to earn 80% or more of your indexed monthly pre-disability

---

[2] Unum Life issued Long Term Disability Policy Number 143902 002 and Life Insurance Policy Number 143902 to Plaintiff's employer, Pyramid Peak Corporation ("Pyramid Peak") on March 1, 2011.  (118.)

[3] The LTD Policy is found in the Administrative Record beginning at 106.

earnings.

After benefits have been paid for 24 months you are partially disabled when you are not totally disabled and that while actually working in an occupation, as a result of sickness or injury you are unable to engage with reasonable continuity in that or in any other occupation in which you could reasonably be expected to perform satisfactorily in light of your age, education, training, experience, station in life, and physical and mental capacity.

(122.)[4]

The LTD Policy further defines some of the terms used in these definitions:

**SUBSTANTIAL AND MATERIAL ACTS** means [*sic*] the important tasks, functions and operations generally required by employers from those engaged in your usual occupation that cannot be reasonably omitted or modified.

In determining what substantial and material acts are necessary to pursue your usual occupation, we will first look at the specific duties required by your Employer. If you are unable to perform one or more of these duties with reasonable continuity, we will then determine whether those duties are customarily required of other individuals engaged in your usual occupation. If any specific material duties required of you by your Employer differ from the material duties customarily required of other individuals engaged in your usual occupation, then we will not consider those duties in determining what substantial and material acts are

---

[4] The Court cites the LTD administrative record by page number only. Citations to other sources are more detailed.

necessary to pursue your usual occupation.

. . . .

**USUAL OCCUPATION** means the substantial and material acts you are routinely performing for your Employer when your disability begins.

(138-39.)

When paying benefits for partial disability, during the first 12 months of partial disability, the Policy pays benefits in the amount that will, when added to the actual earnings, equal to an amount up to[5] 100% of the covered person's indexed monthly pre-disability earnings.  (124.)  Thereafter, 50% of the disability earnings are subtracted from the monthly payment.  (124.)  Unum refers to this provision as "a work incentive provision."  (Def. Opening Br. at 5.)

The Life Policy contains a life waiver of premium ("LWOP") provision for eligible employees who become disabled from "any gainful occupation" before age 60.  (LWOP AR 75-77.)[6]  Specifically, the Life Policy provides:

Your life insurance premium will be waived if you meet these conditions:

-you are less than 60 and insured under the plan.

-you become disabled and remain disabled during the elimination period.

-you meet the notice and proof of claim requirements for disability while your life insurance is in effect or within three months after it ends.

-your claim is approved by Unum.

After we approve your claim, Unum does not require further premium payments for you while you remain

---

[5] Under the LTD Policy, benefits are subject to offset for certain specified income sources. (*See* 124-28.)

[6] The LWOP administrative record can be found on the docket beginning at Docket Entry 18-24.

disabled according to the terms and provisions of the plan.

(LWOP 76.)  The Life Policy's definition of "disability" is differs from the definition found in the LTD Policy:

### HOW DOES UNUM DEFINE DISABILITY?

You are disabled when Unum determines that:

-during the elimination period, you are not working in any occupation due to your injury or sickness; and

-after the elimination period, due to the same injury or sickness, you are unable to perform the duties of any gainful occupation for which you are or become reasonably fitted by training, education or experience and which disability is, in fact, preventing you from engaging in any employment or occupation for wage or profit.

(LWOP AR 76).  The Life Policy defines "gainful occupation" as "an occupation that within 12 months of your return to work is or can be expected to provide [the covered person] with an income that is at least equal to 60% of [his or her] annual earnings in effect just prior to the date your disability began."  (LWOP AR 90.)

### B.    Plaintiff's Employment

Beginning in 2005, and at all relevant times, Plaintiff was the Chief Operating Officer ("COO") for the Pyramid Peak Corporation ("Pyramid Peak"), a healthcare practice management company.  (*See* AR 1207, 1215-17.)  As COO, Plaintiff reported directly to Pyramid Peak's Chief Executive Officer ("CEO") Richard M. Paicius, M.D.  (1215.)  Both Plaintiff and Dr. Paicius submitted declarations regarding Plaintiff's job duties, performance, and decline.  (1207-09 (Plaintiff); 1215-17 (Dr. Paicius).)[7]

---

[7] The Court finds both Dr. Paicius and Plaintiff to be credible and reliable.  The Court credits Dr. Paicius's and Plaintiff's descriptions of Plaintiff's job duties.  Their descriptions are based on first-hand observations and experiences over the course of nine years.  Dr. Paicius was the CEO of

As Chief Operating Officer, Plaintiff was responsible for overseeing the firm's human resources, office operations, billing collections, business forecasting and planning, new accounts, and other managerial tasks. (1215.) She was in charge of business development and negotiating contracts with insurance companies. (1207.) Plaintiff managed over 70 employees. (1207, 1215.) (1215.) Plaintiff's position was "extremely demanding," and she "essentially managed the entire company day-to-day." (1215-16.) Prior to her disability, Plaintiff was in the office approximately 50-60 hours per week. (1215.)

Plaintiff was diagnosed with cancer in April 2014. She continued to work after her diagnosis but left work at the end of September 2014. Plaintiff thereafter underwent extensive treatment (including radiation, chemotherapy, stem cell transplants, immunosuppressants, and re-vaccination) before returning to work part time in January 2016. Once she returned to work, previously routine tasks took her twice as long to complete and she made many more errors than she did before her illness and treatment. (1208, 1217.) In comparison to her pre-illness level of performance, her work was inconsistent and unpredictable. (1216.) Plaintiff tired easily and could not maintain a predictable work schedule. (1208, 1216.) Moreover, Plaintiff's prescription pain medication impeded her ability to focus on her work. (1209.) However, because of Plaintiff's work history, the CEO accommodated her need to work at her own pace and on her own schedule. (1216.) Plaintiff's overall work capacity was reduced to about 25% to 30% of what it was before her illness and treatment. (1208, 1217.)

## C.   Administrative Record Chronology

The Administrative Record reveals medical treatment and activity regarding

---

Pyramid Peak, he directly supervised Plaintiff's performance, and he was therefore knowledgeable regarding Plaintiff's job duties. Moreover, his description is consistent with Plaintiff's own description, which adds to its persuasive value, as Plaintiff had the most knowledge of her job duties. Significantly, the descriptions given by Dr. Paicius and Plaintiff are wholly consistent with the description set forth in Unum's vocational review, which was based on a generally applicable job description for a Chief Operating Officer. (See 829-31.)

Plaintiff's claim for benefits and appeal as reflected in the following chronology.

| | |
|---|---|
| early 2014 | Sometime in 2014, Plaintiff began noticing a waxing and waning pain in her right hip. (643.) |
| 04/20/2014 | She sought evaluation and was subsequently diagnosed with multiple myeloma and secondary AL amyloidosis on 04/20/2014. (84.) |
| 04/29/2014 | A skeletal bone survey revealed diffuse lytic lesions throughout her skeleton including her skull, ribs, and clavicle, and a mass of cancerous cells on her right pelvis that was treated with radiation and chemotherapy beginning in May 2014. (557.) |
| 09/29/2014 | Plaintiff was awarded benefits under Social Security Disability Insurance ("SSDI") based on the Social Security Administration's finding of disability. (250.) |
| 09/30/2014 | Plaintiff's claim was approved by Unum. (869.)  The 90-day elimination period began running on this date. |
| 10/10/2014 | Plaintiff was hospitalized for six days. (67.) |
| 11/03/2014 | Plaintiff was hospitalized for six days. (67.) |
| 12/05/2014 | Plaintiff was hospitalized for four days. (67.) |
| 12/29/2014 | The 90-day elimination period on Plaintiff's claim expired and Unum began paying benefits. (869.) |
| 02/09/2015 | Plaintiff underwent an autologous peripheral stem cell transplant.  (68.) Before the transplant, Plaintiff received "high dose" chemotherapy. (1202.) |
| 04/14/2015 | On this date, Plaintiff underwent a second allogeneic peripheral stem cell transplant of tissue donated by her brother. (396, 1202.)  In preparation for the transplant, she received another intensive course of chemotherapy and total body radiation. (1202.)  Afterwards, Ms. Brown began taking immunosuppressant drugs to prevent graft-versus-host disease ("GVHD"). (1202.) |

| | |
|---|---|
| 08/26/2015 | Plaintiff completed a Disability Status Update form, listing her daily activities as "reading, computer, light exercise, and household chores." (379.) |
| 09/02/2015 | Plaintiff's oncologist, Marco Mielcarek, M.D., completed Disability Status Update form, which indicated a tentative return to work ("RTW") date for Plaintiff of one year after her 04/15/2015 stem cell transplant. (395-97.) |
| 09/23/2015 | Plaintiff's bone marrow examination was negative for multiple myeloma. (542.) |
| Dec. 2015 | Plaintiff was treated for an upper respiratory infection. (542.) |
| 01/12/2016 | Plaintiff's treating oncologist, L. Stuart Nagasawa, M.D., reported that Plaintiff's energy levels continued to improve and that she was exercising regularly. (542.) |
| 01/16/2016 | Plaintiff returned to work part time. (469.) |
| 02/03/2016 | Plaintiff notified Unum Life on 2/3/2016 that she had returned to work at Pyramid Peak part time on 1/16/2016. (464, 469). In some weeks in 2016, Plaintiff worked as many as 35 hours per week. (617-27.) Initially she worked from home and by May 2016 she occasionally went into the office for meetings. (513.) |
| 02/10/2016 | Plaintiff saw Dr. Nagasawa on a day when she had a cough and fever. (548 (Plaintiff reported 104°F fever and productive cough with green sputum.)) Plaintiff was sent to the ER for bronchitis and possible early pneumonia. (549). Plaintiff was admitted to the hospital for three days. (551.) |
| 03/18/2016 | Plaintiff was again evaluated for a persistent, productive cough. (643-44.) |
| April 2016 | Plaintiff was hospitalized for pneumonia and treated with a pulmonologist for respiratory symptoms. (730.) |

| | | |
|---|---|---|
| 04/25/2016 | Oncologist Rachel Salit, M.D., Seattle Cancer Care Alliance ("SCCA"), noted that Plaintiff's cancer was in remission, that she no longer had the need to take immunosuppression medications, and that she had no recent problems with GVHD. She vaccinated Plaintiff with the beginning of an adult vaccination schedule and recommended a six-month follow up. (641-47.) |
| 05/04/2016 | When Unum called Plaintiff, she reported that her cancer was in remission, but that she was experiencing joint pain, cough, feet swelling due to GVHD, and fatigue. (513.) Plaintiff also reported she was working about 15 hours a week, mostly from home, because her immune system was not yet back to full strength. (513.) Plaintiff reported that "she gets tired easily." (513.) |
| 05/24/2016 | Plaintiff's primary care physician, Madineth Muy, M.D., provided a written response to Unum's inquiry regarding Plaintiff's restrictions and limitations ("R/Ls"). (596-99.) Dr. Muy indicated that Plaintiff was limited to working fewer than 20 hours per week based on fatigue and pain, and that she expected Plaintiff to continue to have these R/Ls until 02/16/2017. (597.) |
| July 2016 | Plaintiff developed sinusitis and had symptoms for two weeks. (963.) |
| 08/18/2016 | A physician employed by Unum, Todd Lyon, M.D. (Board-Certified in Family Practice) performed a paper review of Plaintiff's claim and medical status. (730-33.) Additionally, he spoke with Dr. Muy, and concluded based thereon that Plaintiff's cancer and treatment were no longer disabling, but that Plaintiff's continuing respiratory illness could be expected to render her disabled for another month. (731, 733). In a letter sent to Dr. Muy, Dr. Lyon set forth his understanding of their conversation, which was that Plaintiff was expected to be out of work another month based on her pulmonological symptoms, but that after that |

9

| | |
|---|---|
| 1 | time she could return to work in her sedentary occupation. (733.) |
| 2 | 08/23/2016 Unum sent a letter to Plaintiff explaining that based on Dr. Lyon's |
| 3 | consultation with Dr. Muy, Plaintiff was anticipated to transition back to |
| 4 | work full-time by 10/01/2016. (754-55.) In the event she was unable to |
| 5 | do so, Unum directed Plaintiff to submit additional medical evidence and |
| 6 | certification of ongoing impairment from her pulmonologist. (*Id.*) |
| 7 | 08/31/2016 Plaintiff confirmed to Unum that she believed that her respiratory illness |
| 8 | was not disabling, but that she still had issues related to cancer, |
| 9 | neuropathy and fatigue. (762.) Therefore, she asked to have her |
| 10 | oncologist support her claim rather than her pulmonologist, and Unum |
| 11 | responded that she could. (762.) Plaintiff also noted she had performed |
| 12 | some consulting work for an entity other than her regular employer, and |
| 13 | that she would send payroll information.[8] (762.) |
| 14 | 09/23/2016 Plaintiff saw Dr. Nagasawa, and he rated her Karnofsky Performance |
| 15 | Status ("KPS") as 80%, which corresponds with normal activity with |
| 16 | effort and some signs or symptoms of disease.[9] (790.) Dr. Nagasawa |
| 17 | filled out a Disability Status Update form noting that due to GVHD, low |
| 18 | immune system, and high risk of relapse, Plaintiff was limited to working |
| 19 | 20 hours per week. (767.) Dr. Nagasawa noted that he believed this |
| 20 | limitation was permanent. (767.) |
| 21 | Oct. 2016 Plaintiff had a sore throat with high fever (105°F). (963.) |

---

[8] Plaintiff worked for this other company only 13.25 hours total, and she did so over the course of approximately 2 weeks. (814.)

[9] The Karnofsky Performance Status is defined as:

> A standard way of measuring the ability of cancer patients to perform ordinary tasks. The Karnofsky Performance Status scores range from 0 to 100. A higher score means the patient is better able to carry out daily activities. Karnofsky Performance Status may be used to determine a patient's prognosis, to measure changes in a patient's ability to function, or to decide if a patient could be included in a clinical trial.

NCI Dictionary of Cancer Terms, Nat'l Cancer Inst. at the Nat'l Inst. of Health, U.S. Dep't of Health and Human Servs., https://www.cancer.gov/publications/dictionaries/cancer-terms/def/karnofsky-performance-status (last visited 01/14/2019).

| | | |
|---|---|---|
| 1 | 10/13/2016 | Unum's Senior Vocational Rehabilitation Consultant ("VRC") Sharon |
| 2 | | Shou, CRC, LCPC, performed a vocational review based on Plaintiff's |
| 3 | | file.  (829-31.) She noted that the position of Chief Operating Officer |
| 4 | | involves heading, planning, overseeing and coordinating the entire |
| 5 | | operation of an organization toward the achievement of established |
| 6 | | policies, goals and operating objectives. (829.)  The physical demands of |
| 7 | | the job include (1) exertion of force no greater than 10 lbs. occasionally; |
| 8 | | (2) sitting constantly; and (3) brief walking and standing occasionally. |
| 9 | | (830.)  She noted that the work is usually performed in an office |
| 10 | | interacting with people, and that the work can involve travel for meetings |
| 11 | | and conferences.  (830.)  The vocational review also notes that half of all |
| 12 | | COO's work more than 40 hours per week.  (830.) |

10/25/2016    Dr. Lyon spoke with Dr. Nagasawa, who confirmed that Plaintiff's cancer was in remission and Plaintiff had normal physical findings, but Dr. Nagasawa also stated that Plaintiff continued to report fatigue.  (852.) Dr. Nagasawa noted that Plaintiff's job was demanding, and he did not believe that she could sustain full time work activities due to job stress. (852.)

11/03/2016    Plaintiff saw an Orthopedist, Michael Marandola, M.D., who examined Plaintiff for hip pain. He diagnosed her with a strain/tendonitis of the right gluteus medius and psoas, and degenerative arthritis of the sacroiliac joint. (911-13.)  Dr. Marandola recommended outpatient physical therapy for stretching, strengthening, and stability of the hip. (913.)  He also recommended follow-up in 4 to 6 weeks.  (913.)

11/07/2016    SCCA conducted a follow up evaluation of Plaintiff.  (962-70.)  The evaluator noted mild, stable GVHD, hip pain that was being treated by an orthopedist, cancer remission, and multiple infections in the previous year.  (966-67.)  Because of the infections, SCCA recommended to

Dr. Nagasawa that Plaintiff be given intravenous immunoglobulin through the winter months. (962.) SCCA doctors noted: "She is able to work at 80% of her pretransplant activities."[10] (965.) The evaluation also noted that Plaintiff "is not quite back to normal, but she is able to do everything she would like to do in a given day." (965.)

11/10/2016   Dr. Lyon noted his disagreement with Dr. Nagasawa's 09/23/2016 assessment, based on the normal physical findings and the fact that Plaintiff had recently traveled to Mexico to vacation with her family. (855.) Although Dr. Lyon noted that "[t]he insured has reported chronic pain and fatigue," he noted the absence of a medical explanation therefor and that these reports were "inconsistent with her reported vacation travel." (855.) He also relied on Dr. Nagasawa's assessment of Plaintiff's KPS of 80% in September 2016. (855.)

11/15/2016   Unum's Designated Medical Officer, Herbert M. Dean, M.D., FACP (Board-certified in Hematology, Oncology and Internal Medicine), reviewed Plaintiff's medical records. (857-62.) Based thereon, Dr. Dean opined that the 20-hour work week limitation identified by Dr. Nagasawa was not supported because Plaintiff's respiratory infection had abated, she had restarted her immunization program, she was exercising, and that she had been working part-time since early 2016. (859-61.) Dr. Dean also took note of the fact that Plaintiff was in complete remission, the length of time that elapsed since she had been off immunosuppressants with no GVHD except eye dryness, and Plaintiff's normal lab results and bone marrow findings. (860-61.) Dr. Dean noted Plaintiff's KPS of 80%, and he opined that in light of Plaintiff's ability to carry on normal

---

[10] One of the attending physicians who signed this document, Mary Flowers, M.D., later clarified this statement as meaning only that Plaintiff could perform 80% of her pre-transplant daily activities. Specifically, as part of the appeal, on June 12, 2017, Dr. Flowers sent a letter that clarified that the 80% statement was not meant as an assessment of Plaintiff's vocational capacity. (1712 ("We refer to activities of daily living, not vocational capacity.").)

12

|  |  |
|---|---|
|  | activities with only minor signs of symptoms of disease her KPS was more consistent with a 90% rating. (861.)  In light of these indicators, Dr. Dean found no residual medical R/Ls present at a level that prevented Plaintiff from resuming her pre-illness level of activities full time. (861.) |
| 11/17/2016 | Unum sent Plaintiff a letter notifying her that her benefits and waiver of long-term disability premium were being terminated. (868-73, 875.) Unum's reason for terminating Plaintiff's benefits was that there had been an improvement in Plaintiff's medical condition, *i.e.*, her cancer was in remission, she no longer took immunosuppressants, she increased her activities, and she had been able to travel. (869.)  Unum Life also advised Plaintiff she could appeal within 180 days. (871-72.) |
| 12/23/2016 | Additional medical records in support of Plaintiff's claim, including Dr. Marandola's report and a report of a follow up with the SCCA, were sent to Unum. (990.) |
| 01/10/2017 | Upon review of the additional records, Dr. Dean reported that they did not change his opinion. (982-86.)  He noted that Plaintiff's remission was evidenced by a number of objective tests. (986.)  Dr. Dean also noted that Plaintiff's hip pain was being treated, that her GVHD was mild, and that she was receiving adult vaccinations.  Dr. Dean also noted that Plaintiff reported the ability to engage in physical activities, such as walking and exercising. (986.)  Of particular note, Dr. Dean relied on the SCCA letter that Plaintiff was able to work at 80% of her pre-illness level. (986.)  He also took note of Plaintiff's KPS of 90%. (986.) |
| 01/12/2017 | Unum sent Plaintiff a letter advising her of its position that the additional records did not establish that Plaintiff was unable to work as of 11/18/2016. (989-92.)  Unum acknowledged Plaintiff's hip pain, but pointed out that it was being treated. (990.)  Unum also acknowledged Plaintiff's history of recent infections and the recommendation that she |

13

continue with immunosuppression throughout the winter months, but Unum stated that its physician reviewer opined that the infections were not significant enough or frequent enough to justify any ongoing R/Ls. (990.) Finally, Unum relied on Plaintiff's KPS of 90% to establish that she was able to carry on her normal activities with minor signs or symptoms of her disease. (990.) Plaintiff was advised she could still appeal within the time frame set forth in the 11/17/2016 letter. (991-92.)

03/02/2017    Dr. Nagasawa's notes indicated that Plaintiff's "brain fog" limited her ability to work fulltime, and he estimated she could work 20 hours per week. (1405.)

04/05/2017    Beginning 04/05/17, Plaintiff underwent a two-day independent neuropsychological examination by Roger Light, Ph.D., Diplomate, Clinical Neuropsychology, Board Certified Psychologist. Over the course of those two days, Dr. Light interviewed Plaintiff for two hours, and he administered a battery of tests that took approximately 5.5 hours to complete. (1041-42.)

05/26/2017    In support of her appeal, Plaintiff submitted a letter from her oncologist. (1202-03.) Specifically, Dr. Nagasawa wrote a letter regarding Plaintiff's cognitive dysfunction, noting that based on his observation during Plaintiff's monthly office visits and his review of relevant medical literature, she appeared to suffer from a cognitive impairment that is known to afflict "a significant subset" of patients who have undergone the "aggressive" cancer treatment that Plaintiff underwent. (1202-03.) According to Dr. Nagasawa, it is documented in the medical literature that the levels of life-threatening toxicities to which Plaintiff was exposed as result of such treatment are known to cause cognitive decline. (1203.) Dr. Nagasawa reiterated his opinion that Plaintiff remained disabled. (1203.) Dr. Nagasawa based his opinion on the neuropsychological

14

assessment and interactions with and his treatment of Plaintiff during
monthly visits for approximately three years beginning April 2014.
(1202-03.)

06/06/2017     Dr. Light issued his report following his neuropsychological examination
of Plaintiff on 04/05 and 04/06/2017. (*See generally* 1028-66.) Dr. Light
made behavioral observations during his two-hour interview of Plaintiff.
(1042-43.) He noted her evident fatigue on the first day, and he noted
that on three occasions during a two-hour interview, she began speaking
only to lose her train of thought. (1042.) Dr. Light found the objective
tests to be valid for clinical interpretation. (1043.) Based on his
observations and the test results, he expressed the opinion that the results
confirmed the presence of cognitive deterioration after Plaintiff's cancer
diagnosis and treatment. (1056.) He found that the identified defects
precluded Plaintiff from working full time and opined that a work week
of 10 to 15 hours would be a more appropriate long-term goal for
Plaintiff. (1056.) Plaintiff passed all motivational measures, except the
Finger Tapping Test, which was only slightly below the level used to
raise the possibility of sub-optimal effort. (1043.) However, Dr. Light
opined that because Plaintiff passed all the other motivational thresholds,
it was likely that Plaintiff's slowed motor and processing speed issues
(which were demonstrated upon testing) accounted for this relatively
poor performance rather than any suboptimal effort. (1043.) Overall,
Dr. Light found Plaintiff's performance to be consistent with that
expected by a neurocognitive decline often associated with the type of
cancer treatment that Plaintiff received:

> While displaying multiple areas of intact cognitive
> functioning, the obtained neuropsychological profile is
> consistent with Mild Neurocognitive Disorder, likely

> due to systemic impact of her life-threatening illness,
> coupled with the dual insults of chemotherapy and
> radiation exposure used to treat her cancer. . . . The
> most common residual issues identified in such cancer
> survivors are in the domains of memory, attentional
> functions, and processing speed, [which is] consistent
> with the finding from the current neuropsychological
> assessment."

(1053.)  He found a number of areas of neurocognitive decline that could
prevent Plaintiff from performing any executive level occupation:

> The current findings of relative, and in some cases,
> absolute deficits are entirely inconsistent with her
> reported pre-illness function level.  Issues with
> proactive interference, cognitive fatigue, maintenance
> in train of thought, processing speed, and fine motor
> speed are all highly inconsistent with her premorbid
> functional level and the severity of these issues would
> clearly be expected to limit her ability to perform a
> high level executive position on a full time basis.

(1051.)  Although deferring to her physicians regarding medical
restrictions and limitations, Dr. Light also opined that Plaintiff's "evident
physical limitations due to frequent headache, hip, and scapular pain
[were] likely to interfere with her cognition and adaptive functioning."

(1052.)  Ultimately, Dr. Light expressed his opinion regarding Plaintiff's
vocational capacity in this manner:

> Therefore, regarding the question of whether
> [Plaintiff] is capable of returning to her occupation as
> Chief Operating Officer for a company requiring

extended hours and high level executive functioning, attentional functioning, and speed in decision-making, it is clear that [Plaintiff] has deficits that would preclude her from working at the high level she had prior to her illness. . . . If she was somehow able to return [to work] from a physical standpoint, . . . her distractibility, limited processing speed, and issues with aspects of executive functioning and visual memory would preclude her from working successfully at her high level occupation.

(1052.)

06/12/2017    Dr. Flowers also weighed in on Plaintiff's vocational capacity. (1712.) Specifically, she noted that Plaintiff's "complaints [were] consistent with the chemotherapy-associated cognitive dysfunction and fatigue that [Dr. Flowers] often see[s] in similarly situated patients." (1712.) Dr. Flowers offered an opinion similar to that of Dr. Nagasawa: "In my opinion, it is a reasonable medical certainty that the toxicities of Ms. Brown's chemotherapy caused her current symptoms of fatigue and cognitive decline." (1712.) In this letter, Dr. Flowers also clarified a previous statement regarding Plaintiff's physical condition as referring only to Plaintiff's ability to engage in daily activities and not referring to her vocational capacity. (*See supra* note 10.)

07/12/2017    Unum's in-house licensed psychologist, Jana G. Zimmerman, Ph.D., reviewed the raw data underlying Dr. Light's neuropsychological assessment and the assessment itself. (1769-72.) Dr. Zimmerman opined that the data were inconsistent with Dr. Light's conclusions. (1770.) She observed that most of the test scores fell within normal limits, and "[t]he rare low scores fell within expectation for normal variation with no

17

uniform evidence of cognitive deficits." (1770.) Dr. Zimmerman also
disagreed with Dr. Light's observation that Plaintiff's low score on the
Finger Tapping Test was likely due to slowed motor and processing
speed issues rather than suboptimal effort. (*Compare* 1770
(Dr. Zimmerman) *with* 1043 (Dr. Light).) Instead, Dr. Zimmerman
found significant that Plaintiff performed within normal limits in "the
more challenging Grooved Pegboard performances on this measure of
fine motor speed/manual dexterity."[11] (1770.) More substantively,
Dr. Zimmerman observed that Plaintiff's overall processing speed
performance "fell largely within normal limits," as did "[c]ognitive set
loss errors" and "memory test performances." (1771.) Dr. Zimmerman
commented on Plaintiff's MMPI-2 personality test results on the issue of
Plaintiff's response to her illness. (1772.) Based on the results,
Dr. Zimmerman suggested that Plaintiff could be minimizing
psychological concerns regarding her illness in a manner that might result
in perceived limitations on her functioning.[12] (1772.) Dr. Zimmerman
recommended clinical evidence be considered together with the test
results data to formulate an opinion regarding whether Plaintiff suffered
from a psychological impairment. (1772.)

July 2017    Two pathology reports related to Plaintiff's dental work raised the
suspicion that Plaintiff's cancer had returned. (1835, 1839.) A report

[11] Dr. Zimmerman also observed that Plaintiff's responses showed inconsistent patterns and that she
had relatively better performance on the more challenging aspects of other tests: processing speed
performance and working memory performance. (1771.) She does not explain the significance of
these observations, but Dr. Light interpreted them as implying suboptimal effort. (1823.) Dr. Light
clarified that although Plaintiff's scores in these areas were "within normal limits," they were in the
low average range, which Dr. Light viewed as highly inconsistent with Plaintiff's likely pre-
diagnosis functioning level. (1823.)

[12] Dr. Light acknowledged in his initial report that persons with this two-point code "may prefer
medical explanations for their symptoms," and they may be "unwilling[] to acknowledge
psychological factors underlying their symptoms." (1050.) Nevertheless, in his response to
Dr. Zimmerman's report, Dr. Light correctly pointed out that Plaintiff had been devastatingly ill with
an incurable condition whose treatment can be worse than the illness itself and which may reoccur at
any time. (1824.)

1
2
3
4

dated 07/17/2017 noted that an area of Plaintiff's mandible was "supportive of active lesions of multiple myeloma" and that "[r]eferral to the primary oncologist [was] strongly suggested to manage this patient." (1839.)  The other report noted "[i]ncreased light chain."[13] (1835.)

5
6
7
8
9
10
11
12

07/21/2017  Dr. Light provided a response to Dr. Zimmerman's report regarding his comprehensive neuropsychological assessment of Plaintiff.  (1822-24.) Dr. Light first noted that Dr. Zimmerman did not examine or interview Plaintiff personally, and that her report "must be understood in that light."  (1822.)  Dr. Light defended his own clinical observations of Plaintiff, including Plaintiff's loss of train of thought and observed fatigue.  (1824.)  Dr. Light stated that his overall assessment was informed by his clinical observations of Plaintiff.  (1822, 1824.)

13
14
15
16
17
18
19
20
21
22
23
24
25
26

Next, Dr. Light criticized Dr. Zimmerman's conclusion that Plaintiff's objective test results did not support a cognitive impairment because that conclusion was based on a comparison of Plaintiff's results to normative data rather than a comparison of the level of Plaintiff's cognitive functioning on the testing dates with the likely level of Plaintiff's cognitive functioning before she was treated with chemotherapy drugs. (1822.)  Dr. Light believed Dr. Zimmerman's methodology to be flawed in that it would virtually never reveal a neuropsychological decline in a high functioning individual.  (1822 ("Education and intelligence are cognitive reserves that protect high functioning individuals from suffering extreme declines in many areas of cognition despite neurological brain insults.").)  Dr. Light rejected the suggestion that Plaintiff's effort was sub-optimal.  Dr. Light found that fourteen of the fifteen tests that measure effort "were overwhelmingly consistent with

27
28

---

[13] Increased light chain ratios are an indicator of active myeloma.  (*See, e.g.*, 641, 643 (tracking the history of Plaintiff's light chain ratios at various disease and treatment phases); 859 (reviewing oncologist identifying Plaintiff's diagnosis as "kappa light chain multiple myeloma").)

strong effort," and the one that was slightly below the others is less sensitive and more prone to false positive measures. (1823. s*ee also* 1043 )  Dr. Light reiterated that two specific areas of deficit were motor speed and processing speed. (1823.)  These two areas revealed cognitive functioning in the lower end of average to borderline deficient range, they tested at this level consistently, and they tested below all other intelligence indices. (1823.)

07/31/2017  Plaintiff's counsel provided her dental pathology reports to Unum. (1844.)

08/08/2017  Plaintiff's dental pathology reports were reviewed by Unum's physician, Scott Norris, M.D. (Board Certified in Family, Occupational and Aerospace Medicine). (1861-66.)  Dr. Norris noted although the dental pathology reports possibly showed active lesions of multiple myeloma, no results from follow-up oncologic tests had been provided, and the findings could be explained by residual nonspecific findings rather than active disease. (1862-63.)  After reviewing Plaintiff's other relevant medical history, Dr. Norris noted his agreement with Dr. Zimmerman that Plaintiff's reports of cognitive impairment were not supported. (1865.)  Moreover, Dr. Norris noted that Plaintiff's reports of fatigue were not supported in light of part time work, travel, volunteer work, involvement with church, and exercise. (1864.)  Dr. Norris also relied on the SCCA notation that Plaintiff "is able to do everything she would like to do in a given day" and that she was "able to work at 80% of her pretransplant" level. (1864; s*ee supra* note 10.)   Although Dr. Norris acknowledged that the notation was not meant to refer to vocational capacity, he nonetheless noted that Plaintiff's oncologist rated her with a KPS of 80-90%, which corresponds with the ability to carry out daily activities, to work with effort, showing some signs or symptoms of

disease.  (1864.)  Thus, Dr. Norris opined that Plaintiff was not precluded from full time sedentary work.  (1863.)

08/18/2017    Dr. Zimmerman commented on Dr. Light's response.  (1915-17.)  She pointed out support in neuropsychological literature for findings of performance variability among high-functioning adults and that it should not be presumed that high functioning individuals will score equally across all types of cognitive functions.  (1916.)  She also stated that in certain instances, neuropsychological literature supports the proposition that the processing speed of high-functioning individuals can still earn low scores on a specified test.  (1916.)

09/15/2017    Unum upheld the denial of LTD benefits and LWOP.  Unum's denial letter explained that as to Plaintiff's claimed neurocognitive deficit, most of her test scores were within normal limits, and the rare low scores were within the expected normal variation.  (1931-32.)  Thus, the test results, in Unum's assessment, did not show an impairment that would preclude Plaintiff from performing her occupation on a full-time basis.  (1932 ("[T]he overall testing was within expectations and did not support impaired cognitive function.").)  Unum also relied on Plaintiff's KPS measuring at 80% and 90%, which Unum stated was "consistent with the capacity to perform normal functions, including work, albeit with effort." (1932.)  Unum also rejected Plaintiff's reported fatigue as a basis for her disability because Plaintiff's subjective complaints not been further assessed or treated and, according to Unum, her activities in attending physical therapy, working part time, travel, exercise, and involvement with her church and volunteer activity establish she did not experience disabling levels of fatigue.  (1932-33.)  Moreover, Unum noted that Plaintiff's cognitive deficit was not raised until after her benefits were denied, and although fatigue had been reported before that time, any link

21

between that fatigue and a cognitive decline was not made before benefits were denied.  (1934-35.)

**D.    Chronology from Additional Medical Records Offered by Plaintiff[14]**

07/14/2017    Plaintiff's dentist brought her pathology test results to the attention of an oral medicine specialist at SCCA.  (Doc. 20-2, Ex. A at 37.)

08/18/2017    Edwin Norton Libby, M.D., SCCA, reviewed Plaintiff's case and examined her.  (Ex. A at 26-28.)  He diagnosed Plaintiff as having "[r]elapsed multiple myeloma" based on serum free light chains at increasing levels beginning early 2017, evidence of active lytic lesions in the jaw, and new focal lesions in the left sacrum, humerus and femur.  (Ex. A at 27.)  Dr. Libby recommended a combination of chemotherapy drugs be administered, and he recommended that the maintenance dose of this regimen, if tolerated, be continued indefinitely.  (Ex. A at 27.)

09/06/2017    Plaintiff underwent the infusion of chemotherapy drug Daratumumab (the first of two infusions in a split dose) at SCCA.  (Ex. A at 18-19.)  She underwent the infusion of the second split dose the following day.  (Ex. A at 15-17.)

09/12/2017    Plaintiff was treated by SCCA dentist, who noted that in July 2017 "[t]here was concern for active myeloma in the mandible."  (Ex. A at 7.)

09/13/2017    Plaintiff underwent another infusion of Daratumumab.  (Ex. A at 4.)

## II.    CONCLUSIONS OF LAW

**A.    Procedural Posture:  Cross-Motions for Judgment**

This matter is before the Court on the parties' cross-Motions for Judgment pursuant to Federal Rule of Civil Procedure 52.  Rule 52 motions for judgment are "bench trial[s] on the record," and the Court "make[s] findings of fact under Federal

---

[14] These records are the subject of Plaintiff's Request to Consider Extrinsic Evidence, which the Court construes as a Motion to Consider Extrinsic Evidence.  (Doc. 20.)  These records are attached as Exhibit A to Plaintiff's Motion.  (Doc. 20-2.)

Rule of Civil Procedure 52(a)." *Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1095
(9th Cir. 1999) (*en banc*). "In a trial on the record, but not on summary judgment, the
judge can evaluate the persuasiveness of conflicting testimony and decide which is
more likely true." *Id.*

### B.    Standard of Review

The Policies at issue are "employee welfare benefit plans" governed by ERISA.
See 29 U.S.C. § 1002(1). In this case, the parties have stipulated that the decision of
the ERISA plan administrator to terminate Plaintiff's LTD benefits and LWOP waiver
is subject to *de novo* review. (Def. Opening Br. at 17; Pltf. Opening Br. at 10.) Under
a *de novo* standard of review, "[t]he court simply proceeds to evaluate whether the
plan administrator correctly or incorrectly denied benefits." *Abatie v. Alta Health &
Life Ins. Co.*, 458 F.3d 955, 963 (9th Cir. 2006). That is, the Court "determines in the
first instance if the claimant has adequately established that he or she is disabled under
the terms of the plan." *Muniz v. Amec Constr. Mgmt., Inc.*, 623 F.3d 1290, 1295-96
(9th Cir. 2010).

### C.    Burden of Proof

Plaintiff bears the burden of establishing by a preponderance of the evidence
her entitlement to benefits (*i.e.*, that she was disabled under the terms of the Policy
during the relevant claim period). *Armani v. Nw. Mut. Life Ins. Co.*, 840 F.3d 1159,
1163 (9th Cir. 2016); *Muniz*, 623 F.3d at 1294. To do so, Plaintiff must establish that
she was more likely than not "disabled" under the terms of the LTD Policy and the
LWOP provision of the Life Policy at the time her benefits were terminated. *See, e.g.,
Hart v. Unum Life Ins. Co. of Am.*, 253 F. Supp. 3d 1053, 1074 (N.D. Cal. 2017);
*Porco v. Prudential Ins. Co. of Am.*, 682 F. Supp. 2d 1057, 1080 (C.D. Cal. 2010).

### D.    Evidence Considered by the Court

The Court generally limits its review to "the evidence that was before the plan
administrator at the time [the] determination [was made]." *Opeta v. Northwest
Airlines Pension Plan*, 484 F.3d 1211, 1217 (9th Cir. 2007). However, Plaintiff

23

moves the Court to consider evidence not before the plan administrator at the time the Plaintiff's administrative appeal was upheld.  Evidence outside the administrative record may be considered in "certain limited circumstances" where additional evidence is necessary to conduct an adequate *de novo* review of the benefit decision. *Opeta*, 484 F.3d at 1217 (citation omitted).

Here, the additional evidence offered by Plaintiff was not considered during the administrative process.  This evidence is relevant on remand, but the evidence is not relevant to the issues currently before the Court.  Therefore, the Court DENIES the Motion to Consider Extrinsic Evidence.  However, because the evidence is relevant to issues on remand, the Court also DENIES the Motion to Strike Extrinsic Evidence.

### E.    Analyzing Medical Evidence

In performing a *de novo* review, the Court is not required to accept the conclusion of any particular treatment provider or medical file review.  For instance, the Court does not accord special deference to the opinions of treating physicians based on their status as treating physicians.  *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003).  Instead, opinions "must . . . be accorded whatever weight they merit." *Jebian v. Hewlett-Packard Co. Employee Benefits Org. Income Prot. Plan*, 349 F.3d 1098, 1109 n.8 (9th Cir. 2003) (citing *Black & Decker*, 538 U.S. at 834).  The Court may give greater weight to a treating physician's opinion where it is evident a particular physician has had a greater opportunity to know and observe the patient than a physician retained by the plan administrator who conducts a file review. *Id.*  However, where a treating physician lacks expertise in a particular area, and the plan's retained expert is a specialist in that area, it may be appropriate for a court to give greater weight to the specialist who merely conducts a file review. *See Black & Decker*, 538 U.S. at 832.  In these cases, courts have noted an apparent tension between treating physicians, who may tend to favor an opinion of "disabled" in a close case, and physicians who are routinely hired by plan administrators, who may favor a finding of "not disabled" in the same case. *See id.*  It is therefore incumbent

upon the Court to carefully assess and weigh all the evidence in light of the issues before the Court.

Here, because the relevant provisions focus on the employee's ability to perform the acts necessary to carry out her usual occupation, whether Plaintiff is "disabled" must be measured by her functional capacity as compared to the duties of her usual occupation.  Therefore, reasoned assessments of what Plaintiff can and cannot do are given greater weight than mere statements of medical diagnoses.  *See, e.g.*, *Shaw v. Life Ins. Co.*, 144 F. Supp. 3d 1114, 1129 (C.D. Cal. 2015); *Holifield v. Unum Life Ins. Co.*, 640 F. Supp. 2d 1224, 1237-38 (C.D. Cal. 2009).  Descriptions of symptomology are likewise more helpful in determining Plaintiff's functional capacity than are mere diagnoses.  *See Muniz*, 623 F.3d at 1296 (recognizing the relevant issue before the district court on *de novo* review was whether the evidence could confirm that the plaintiff's "symptoms rose to the level of total disability such that he was 'unable to perform' . . . essential [job] duties'") (citation omitted); *Delaney v. Prudential Ins. Co. of Am.*, 68 F. Supp. 3d 1214, 1229 (D. Or. 2014) (framing the issue as "whether the preponderance of the evidence establishes that [the plaintiff's] symptoms prevent her from performing the material and substantial duties of her regular job").

> **F.     Plaintiff Has Established She Was More Likely than Not "Disabled" under the "Own Occupation" Clause of the LTD Policy as of November 18, 2016 and Continuing Until at Least December 28, 2016**

Plaintiff's entitlement to LTD benefits depends upon definitions of "disabled" and "partially disabled" found in the LTD Policy, and these definitions have different meanings during and after payment of the first 24 months of benefits.  Here, Unum paid benefits from December 29, 2014 through November 17, 2016, which is approximately 22.5 months.  Therefore, the Court looks first to whether Plaintiff establishes she was more likely than not either "disabled" or "partially disabled" from November 18, 2016 through December 28, 2016.  During this time, Plaintiff must

show by a preponderance of the evidence that she continued to be unable to perform "the substantial and material acts" of her "usual occupation" with "reasonable continuity." "Substantial and material acts" are those "tasks, functions, and operations generally required by employers that cannot be reasonably omitted or modified." An employee with an illness or a condition that causes her to have "good days" (when she can work a full day or partial day) and a significant number of "bad days" (when symptoms preclude work or allow for only minimal work) is not able to perform her occupation with "reasonable continuity." *See, e.g., Thivierge v. Hartford Life & Acc. Ins. Co.*, No. C 05-0163 CW, 2006 WL 823751, at *13 (N.D. Cal. Mar. 28, 2006) ("A full-time employer cannot handle . . . inconsistent attendance and unpredictability."). Plaintiff's "usual occupation" was demanding:  Among other duties, she managed the day-to-day operations of a company that employed over 70 employees.  This job required that Plaintiff work 50 to 60 a week.  Indeed, Unum itself recognized that Plaintiff's "usual occupation" did not exist on a part-time basis in the national economy.  (827.)

There is no basis in the record for concluding that Plaintiff had recovered the ability to perform her usual occupation with reasonable continuity at the time her benefits were terminated on November 17, 2016.  To the contrary, the Court concludes just the opposite:  Based on the administrative record, Plaintiff has established that she was more likely than not "disabled" under the "usual occupation" clause of the LTD Policy as of November 18, 2016 (the day after Unum terminated her benefits) and continuing until at least December 28, 2016.[15]

At the time of Unum's termination of benefits, Plaintiff's oncologist, Dr. Nagasawa, provided an opinion that due to Plaintiff's GVHD, compromised immune system, and risk of relapse, Plaintiff was unable to perform the material and substantial acts of her demanding and stressful usual occupation.  (767.)  He believed

---

[15] As noted below, remand to the plan administrator is required to determine Plaintiff's entitlement to benefits after this date.

that Plaintiff should work no more than 20 hours per week and that this limitation was permanent in duration. (767.) In a subsequent conversation with Dr. Lyon on November 3, 2016, Dr. Nagasawa reaffirmed his opinion, noting additionally that Plaintiff's usual occupation was a stressful one and that she continued to suffer from fatigue. (852.)

Dr. Nagasawa's concerns with Plaintiff's low immune system is borne out by the record: Plaintiff was treated for respiratory infections in December 2015, February 2016, and April 2016, with symptoms continuing into at least September 2016. Plaintiff developed sinusitis in July 2016, and she had a sore throat with a high fever in October 2016. Moreover, on November 7, 2016, based on an objective measure of the strength of Plaintiff's immune system, doctors at SCCA recommended to Dr. Nagasawa that Plaintiff receive intravenous immunoglobulin through the winter months.

The record also supports Dr. Nagasawa's concern regarding a direct correlation between Plaintiff working more than 20 hours a week with the occurrence of these infections. Although Unum repeatedly refers to Plaintiff's ability to work "up to 35 hours a week" in its briefs (*see, e.g.*, Def. Opening Br. at 1-2, 7, 13, 19-21, 23; Def. Resp. Br. at 1, 2, 6, 19-20), this vastly overstates the factual record. The record shows, and the Court finds, that Plaintiff indeed worked some weeks at that rate, but she worked far fewer hours during most other weeks. (*See* Pltf. Resp. Br. at 6 (chart of all hours in 2016).) Specifically, of the 40 weeks Plaintiff worked in 2016, she worked more than 30 hours in only 9 of those weeks. (*Id.*) However, after working an average of 33.25 hours per week for four weeks at the beginning of 2016, Plaintiff sought emergency medical treatment for respiratory symptoms and was hospitalized for three days. (Compare *id.* with 549.) From mid-March to mid-April, Plaintiff worked five other weeks with more than 30 hours, averaging just under 32.9 hours a week. (Pltf. Resp. Br. at 6.) Plaintiff was also hospitalized for pneumonia in April 2016. (730.)

After that time, Plaintiff began working far fewer hours. (*See* Pltf. Resp. Br. at 6.) After the middle of May 2016, Plaintiff worked more than 15 hours in only 3 weeks, working 17, 20.3, and 23 in mid-July, early August, and late September, respectively. (*Id.*) Thus, Unum egregiously misstates the record when it argues that "[t]he record simply does not support that [Plaintiff] was unable to work one extra hour a day each work week in light of her active lifestyle by 11/18/16." (Def. Opening Br. at 21.) Additionally, Unum's argument erroneously assumes that Plaintiff's return to her own occupation would be limited to "one extra hour a day," that is, to a 40-hour work week. Unum's own vocational review found that half of all COOs worked more than 40 hours per week, and the administrative record reveals that in this particular instance, before her illness, Plaintiff herself worked approximately 50 to 60 hours per week. (830, 1215.)

Thus, the Court rejects Unum's contention that Plaintiff had herself demonstrated she was capable of resuming her duties as COO by her part time work in 2016. Instead, the Court finds the record more consistent with Dr. Nagasawa's recommended 20-hour work week limitation. In light of this support in the record for Dr. Nagasawa's opinion, and given his involvement in and his familiarity with Plaintiff's illness and treatment, the Court gives great weight to Dr. Nagasawa's September 23, 2016 opinion regarding Plaintiff's limitation of a 20-hour work week.

Conversely, the Court gives little weight to the contrary opinions of Unum's reviewing physicians, Dr. Lyon and Dr. Dean. First, neither of these doctors examined Plaintiff; both merely reviewed Plaintiff's medical records. At the time of his September 23, 2016 opinion, Dr. Nagasawa had the benefit of examining Plaintiff on multiple occasions, had been involved in Plaintiff's treatment for almost two-and-one-half years,[16] and he had the benefit of consultation with doctors at SCCA who also treated Plaintiff.

Moreover, on a fundamental level, there is no evidence that Dr. Lyon or

---

[16] Dr. Nagasawa was Plaintiff's "local oncologist" beginning April 30, 2014. (1202.)

Dr. Dean considered the extremely demanding nature of Plaintiff's usual occupation of Chief Operating Officer before rejecting her physician's 20-hour work week limitation. These reviewing doctors did not discuss Plaintiff's ability to satisfy the non-physical demands of her usual occupation; instead, they focused on the minimal physical demands, finding that Plaintiff could meet those demands.

The non-physical demands of Plaintiff's usual occupation were known to Unum, which had the benefit of its own vocational review. In the administrative record, Unum's Vocational Rehabilitation Consultant set forth the non-physical demands of Plaintiff's usual occupation under the subheadings "Work Environment" and "Material and Substantial Duties."[17] (829-30.) Under Work Environment, the vocational review notes that half of all COOs work more than 40 hours per week. (830.) Under the subheading Material and Substantial Duties, Plaintiff's usual occupation has a host of demanding tasks:

> Collaborates in the planning and formulation of organization policies and practices. Oversees the design, operation, and improvement of the system that creates and delivers the organization's products or services. Oversees and adjusts [the] organization's processes and operations as necessary to ensure efficient and effective execution of policies and procedures. . . . Provides operational guidance in analyzing and appraising the effectiveness of organizational operations. Participates in the planning, development, implementation, and evaluation of key business and performance goals, short- and long-term strategic planning and objectives, plans, budgets, programs, and policies. Evaluates operating results throughout the

---

[17] Unum's failure to consider such "[m]aterial and [s]ubstantial [d]uties" is a fundamental failure because the inability to perform the "material and substantial acts" of one's "usual occupation" with "reasonable continuity" is the *sin qua non* of the definition of "disabled" under the LTD Policy.

1        organization to ensure that organization growth and

2        objectives are being met. Guides and leads other members of

3        management.  Monitors the capital expenditure and asset

4        redeployment activities.

5  (829-30 (paragraph structure altered).)

6        In his initial review on August 10, 2016, Dr. Lyon noted that Plaintiff's usual

7  occupation required little by way of physical demands (occasional lifting of no more

8  than 10 pounds, sitting with brief periods of standing or walking, daily interaction

9  with others, and involved travel), but made no mention of the demanding, stressful

10  nature of Plaintiff's job of managing the operations of Pyramid Peak and its over 70

11  employees.  When Dr. Lyon conferred with Dr. Nagasawa on October 25, 2016,

12  Dr. Nagasawa indicated the 20-hour work week limitation was based on the fact "that

13  [Plaintiff] works at a demanding job" and that he "doubt[ed] that she [could] sustain

14  full time work activities due to job stress."  (852.)  Even after this discussion,

15  Dr. Lyon did not take into account the non-physical demands of Plaintiff's usual

16  occupation.  Instead, Dr. Lyon concluded, based on "the normal [physical] findings

17  and documented family travel to Mexico," the evidence did not support

18  Dr. Nagasawa's 20-hour work week limitation.  (852.)  Dr. Dean's review likewise

19  did not discuss the non-physical demands of Plaintiff's usual occupation, focusing

20  instead on Plaintiff's physical activities.[18]  Simply put, the "heavy lifting" of

21

22  [18] As many courts have noted, some sedentary occupations simply require much higher cognitive functioning levels than others. *See, e.g., Jahn-Derian v. Metro. Life Ins. Co.*, No. CV 13-7221 FMO (SHX), 2016 WL 1355625, at *10 (C.D. Cal. Mar. 31, 2016) (noting that the insurer did not address

23  issues that "might affect her ability to engage in tasks requiring mental focus and complex thought"); *Fleming v. Kemper Nat. Servs., Inc.*, No. C-03-5135 MMC, 2005 WL 839639, at *20 (N.D. Cal.

24  Apr. 11, 2005) (rejecting the reports of insurer's two reviewing doctors because their reports "focused largely on [the plaintiff's] ability to sit, and, after finding that [she] was capable of sitting,

25  concluded that she was not precluded from performing her sedentary job as a financial analyst"); *Sabatino v. Liberty Life Assur. Co. of Boston*, No. C 02-1891 CW, 2003 WL 23932613, at *1 (N.D.

26  Cal. Dec. 9, 2003) ("Simply being able perform sedentary work does not necessarily enable one to work as engineer.").  Plaintiff's usual occupation clearly requires executive-level cognitive

27  functioning.  *See Demer v. IBM Corp. LTD Plan*, 835 F.3d 893, 906 (9th Cir. 2016) ("A job that commands . . . a [high] salary may well require higher levels of mental functioning, including

28  concentration and memory . . . ."); (AR at 829-30 ("[The COO] position is nearly always the second highest paid position in the organization.").

Plaintiff's usual occupation consists of the mental demands and the endurance requirements that arise from the executive nature of her position and her 40+ hour work week.  Unum's reviewing physicians did not factor this heavy lifting into their analyses; as such, their opinions are not given any weight.

Not coincidently, repeating its doctors' error, Unum fails to recognize the non-physical demands of Plaintiff's usual occupation in terminating Plaintiff's benefits.  In its November 17, 2016 termination letter, Unum concluded that Plaintiff could return to her usual occupation because her cancer was in remission, she had been off immunosuppressants for ten months, she had gained weight, she was free of any chronic GVHD symptoms, and her activities (physical exercise, volunteer work, involvement with her church, and family travel) had been increasing.  After considering additional medical evidence, in its January 12, 2017 letter, Unum repeated this emphasis on Plaintiff's physical abilities without considering the stressful, demanding nature of Plaintiff's usual high-level executive occupation.

During the appeal process, Plaintiff submitted additional evidence to support her claim.  This additional evidence further supports Dr. Nagasawa's opinion regarding Plaintiff's 20-hour work week limitation, and it provides an explanation for Plaintiff's consistent reports of fatigue after her cancer treatment.

First, it became apparent that Plaintiff's oncologists' statements of her ability to engage in daily activities were not meant to address her vocational capacity. Dr. Flower's clarification of a statement in SCCA's letter December 23, 2016 to Dr. Nagasawa is the best example of this.  In the letter, SCCA doctors stated: "[Plaintiff] is able to work at 80% of her pretransplant activities."  (965.)  On behalf of Unum, Dr. Dean, in his January 10, 2017 review, translated this statement as: "[Plaintiff] continues to work part time as a consultant, 80% of her pre-illness level." (986.)  Dr. Dean's review was relied upon by Unum in maintaining its decision to terminate Plaintiff's benefits after submission of additional evidence.  (990 ("The second physician who previously reviewed your file also completed an updated

review and [his] opinion was also unchanged.").)  However, Dr. Flowers clarified the
"80%" statement a June 12, 2017 letter:  Dr. Flowers noted that the statement meant
that Plaintiff could engage in 80% of her "activities of daily living," and the statement
did not address Plaintiff's "vocational capacity."  (1712.)

Relatedly, Unum's reviewing physicians placed far too much emphasis on
Plaintiff's reported Karnofsky Performance Status, or KPS.  (*See supra* note 9.) Both
Unum's letter upholding its decision after the submission of additional medical
evidence and Unum's letter upholding its decision on appeal expressly reference
Plaintiff's KPS as a rationale for rejecting her claim.  (990, 1932.)  Indeed, in
upholding its decision to terminate Plaintiff's benefits on appeal, Unum expressly
equated Plaintiff's Karnofsky Performance Status with her vocational capacity: "Her
Karnofsky score and activities are consistent with the capacity to perform normal
functions, including work, albeit with effort."  (1932.)  However, although a patient's
KPS measures her overall health and ordinary functional abilities, it is not meant as a
proxy for vocational capacity in all instances, and particularly not in this instance,
where the physical demands for Plaintiff's usual occupation are not onerous.

Next, looking further into Plaintiff's consistent (but subjective) reports of
fatigue,[19] Plaintiff's oncologists opined in 2017 that they believed she had been
suffering from a cognitive decline and fatigue that is not uncommon in cancer patients
who are treated with aggressive chemotherapy.  These opinions are consistent with the
comprehensive neuropsychological evaluation conducted by Dr. Light.  As such, they
are persuasive in the same manner as is Dr. Light's report.

Finally, Dr. Light's two-day neuropsychological evaluation provided more

---

[19] The evidence regarding Plaintiff's cognitive decline, and the link between Plaintiff's consistently
reported fatigue and cognitive decline, was developed during the appeal process.  Unum took note of
this fact in upholding its decision on appeal.  In its briefing, Unum maintains that this evidence does
not show a cognitive impairment as of the date of the termination of Plaintiff's benefits on
November 17, 2016.  (Def. Resp. Br. at 6.)  However, Plaintiff consistently complained of fatigue,
and Dr. Nagasawa identified fatigue as a reason for limiting Plaintiff to a 20-hour work week.  When
Unum rejected Plaintiff's subjective complaints regarding fatigue as a basis for establishing
disability, Plaintiff's further inquiry into the etiology of her fatigue, including subjecting herself to
objective measures thereof, was a reasonable response in pursuing her appeal.

support for Dr. Nagasawa's 20-hour work week limitation. In fact, Dr. Light recommended a more restrictive limitation of a 10- to 15-hour work week. Dr. Light found the presence of objectively measurable cognitive deterioration in areas that are consistent with the after-effects of aggressive chemotherapy described by Drs. Flowers and Nagasawa. Dr. Light identified a number of cognitive issues that would preclude Plaintiff from performing any executive level occupation on a full-time basis, and he also noted that physical pain was also likely to further interfere with her cognitive function. Based thereon, Dr. Light identified a 10- to 15- work week limitation.

Dr. Zimmerman, Unum's reviewing psychologist, criticized Dr. Light's report. Because Dr. Zimmerman's criticisms do not strike at the heart of Dr. Light's conclusions, they do not undermine the persuasiveness of Dr. Light's opinions. Notably, Dr. Zimmerman did not disagree with Dr. Light's conclusion that the data results were valid for interpretation. (*Compare* 1043 (Dr. Light's conclusion that "the current neuropsychological evaluation was found to be valid for clinical interpretation.") *with* 1769-72 & 1915-17 (Dr. Zimmerman providing alternative interpretations of the test data but not disagreeing with Dr. Light's opinion that the results were valid for interpretation).) Dr. Zimmerman points out that one of fifteen objective measures of effort strayed into the range suggesting suboptimal effort; however, fourteen of these measures did not suggest suboptimal effort. Dr. Zimmerman correctly points out that the majority of Plaintiff's substantive test scores were in the average to superior range, but given Plaintiff's pre-illness excellence in her demanding, executive-level usual occupation, it is still highly likely that Plaintiff experienced a sharp, measurable decline in her cognitive functioning after the treatment of her cancer. Moreover, Plaintiff's processing speed test scores were lower, and processing speed is an area often adversely effected by aggressive chemotherapy. (1053 (identifying declines in "the domains of memory, attentional functions, and processing speed" as "[t]he most common residuals issues identified in

. . . cancer survivors")).)  Dr. Zimmerman also pointed out that Plaintiff's personality tested as one that might unduly focus on physical symptoms rather than psychological limitations, which can lead to an unwillingness to acknowledge any psychological factors underlying their symptoms.  Dr. Light had acknowledged this result, but he noted that this test result is also found in patients with actual medical conditions. Given the nature of Plaintiff's disease, and the rigorousness of her treatment, the Plaintiff's actual physical illness is a more likely explanation for this test result.  But even if it were not, Unum did not heed Dr. Zimmerman's suggestion to further explore any psychological limitations Plaintiff might have.

Thus, the Court credits the comprehensive opinion of Dr. Light as set forth in his report.  Dr. Light combined a records review, personal interview, clinical observations, and objective testing to arrive at his conclusions.  Dr. Light's opinion is also consistent with Dr. Paicius's and Plaintiff's subjective accounts of Plaintiff's declining ability to handle the many non-physical demands of her usual occupation.[20] In contrast to Dr. Light's opinion, Dr. Zimmerman's opinion was a records review, and she was unable to make her own clinical observations.  Her criticisms of Dr. Light's conclusions were at best marginal, and the issue she raised regarding any psychological limitations was not subjected to further review as she suggested.  In short, Dr. Zimmerman's opinion provides no basis for Unum upholding the termination of Plaintiff's benefits on appeal.

One final issue is worthy of note.  In its briefing, Unum relies on the opinion of Plaintiff's primary care physician, Dr. Muy, to support its argument that termination of Plaintiff's benefits was proper, pointing to Dr. Lyon's recounting of a conversation he had with Dr. Muy on August 18, 2016.  (Def. Opening Br. at 19-20.)  This reliance is misplaced.  Dr. Muy's earlier *written* opinion of May 24, 2016 regarding the limitation of a 20-hour work week until February 16, 2017 conflicts with Dr. Muy's

---

[20]  The Court finds Dr. Paicius's and Plaintiff's declarations credible on this issue.  (*See supra* note 7.)

oral opinion as recounted by Dr. Lyon in Dr. Lyon's August 18, 2016 letter. Dr. Lyon's letter suggests the two discussed Plaintiff's then-recent bout with pneumonia and how long that condition was expected to be disabling, but there is no discussion regarding the reason for Dr. Muy's reversal of her earlier opinion, or if the two discussed whether Plaintiff's fatigue and pain had improved.[21]  For this reason, and because it is Dr. Lyon's account of Dr. Muy's oral opinion, the Court gives little weight to the evidence from August 18, 2016.

Therefore, the Court concludes Plaintiff has established by a preponderance of the evidence that she continued to be "disabled" under the "usual occupation" clause of the LTD Policy from the date of Unum's termination letter and continuing at least through December 28, 2016.  Specifically, the Court concludes Plaintiff has established that during this time she more likely than not suffered from disabling cognitive decline, fatigue, and pain, caused by her cancer and/or its treatment, to the extent that she could not engage in the substantial and material acts of her usual occupation with reasonable continuity.  The Court also concludes that Plaintiff's low immune system and risk of relapse further limited her functional capacity, and Plaintiff's 10- to 20-hour work week limitation is supported by the record for an indeterminable time period, but at least until December 28, 2016.

### G.   Plaintiff Has Established She Was More Likely than Not "Disabled" under the LWOP Provision of the Life Policy as of November 18, 2016 and Continuing until at Least December 28, 2016

On this record, Plaintiff also establishes by a preponderance of the evidence that she continued to be disabled under the slightly different definition of "disabled" of the LWOP provision found in the Life Policy.  Specifically, in light of Plaintiff's 10- to 20- hour work week limitation, Plaintiff's continued disability through at least

---

[21] Dr. Lyon asked for feedback from Dr. Muy if the opinion was incorrect, and it appears Dr. Muy did not write back to correct or clarify Dr. Lyon's recounting of her statements.  However, shortly after the date of this letter, on August 31, 2016, Plaintiff acknowledged in a call to Unum that she did not view her respiratory symptoms as disabling and instead maintained that her oncologist, Dr. Nagasawa, should be consulted regarding her restrictions and limitations.

December 28, 2016 precluded her from performing the duties of a gainful occupation that could provide her with an income of at least 60% of her pre-illness annual income.

**H.    Remand to the Plan Administrator is Required for Determination of Entitlement to Benefits after December 28, 2016**

After December 28, 2016, the standard for determining whether Plaintiff remains "disabled" under the LTD Policy and LWOP provision changes to focus on whether Plaintiff is "able to engage with reasonable continuity in *any occupation* in which [she] could reasonably be expected to perform satisfactorily in light of [her] age, education, training, experience, station in life, and physical and mental capacity." (122 (emphasis added).)  Because Plaintiff's claim has not yet been reviewed pursuant to this standard, the Court must remand it to the plan administrator for consideration. *See Saffle v. Sierra Pac. Power Co. Bargaining Unit Long Term Disability Income Plan*, 85 F.3d 455, 460 (9th Cir. 1996) (holding it was error for the district court to order payments beyond the initial 24-month disability period where the standard for determining disability changed after the 24-month mark); *Carey v. United of Omaha Life Ins. Co.*, No. SACV1300740CJCAJWX, 2017 WL 1045077, at *11 (C.D. Cal. Jan. 31, 2017)  (citing *Saffle* and holding that remand to the plan administrator was appropriate remedy to consider whether the plaintiff was disabled under the "any gainful occupation" standard); *Hantakas v. Metro. Life Ins. Co.*, No. 214CV00235TLNKJN, 2016 WL 374562, at *7 (E.D. Cal. Feb. 1, 2016) (same); *Wilkins v. Unum Life Ins. Co. of Am.*, No. CV 10-02940 JSW, 2013 WL 5340512, at *5 (N.D. Cal. Sept. 24, 2013) (same).

**III.    CONCLUSION**

As set forth herein, the Court concludes that Plaintiff has established continued eligibility for benefits under the LTD Policy and the LWOP in the Life Policy from November 18, 2016 And Continuing Until At Least December 28, 2016.  The Court

also concludes that remand to the Plan Administrator is required as to the issue of Plaintiff's continued entitlement to benefits after December 28, 2016.

Accordingly, the Court rules as follows:

Plaintiff's Motion for Judgment is GRANTED IN PART.

Defendant's Motion for Judgment is DENIED.

Plaintiff's Motion to Consider Extrinsic Evidence is DENIED.

Defendant's Motion to Strike Extrinsic Evidence is DENIED.

The matter is REMANDED to the Plan Administrator for further action consistent with this Order, the terms of the LTD Policy, and the LWOP provision of the Life Policy.

**IT IS SO ORDERED.**

**DATED:** January 29, 2019

The Hon. Josephine L. Staton
United States District Judge